USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/19/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WOOLERY & CO., PLLC,

               Plaintiff,

-against-

4M INVESTMENTS, LLC and TED B. MILLER, JR.,

               Defendants.

25-cv-985 (MKV)

OPINION & ORDER
DENYING
MOTION TO DISMISS
OR TRANSFER

MARY KAY VYSKOCIL, United States District Judge:

Defendants 4M Investments LLC and its sole member Ted B. Miller are based in Texas [ECF Nos. 25 ("AC") ¶¶ 8 9; 28 ("Miller Decl.") ¶¶ 3–5]. They engaged Plaintiff Woolery & Co. PLLC, a New York law firm whose attorneys are licensed to practice in New York, to assist with a contemplated hostile takeover of Miller's former company [ECF No. 32 ("Woolery Decl.") ¶¶ 5, 9–11]. *See* AC ¶¶ 12, 13. The Engagement Agreement executed by these sophisticated parties, which is governed by New York law, expressly provides that if a dispute arises between the parties, "the advancement of any reasonable fees for the resolution of such dispute . . . is required." Miller Decl., Ex. G (the "Engagement Agreement" at 2).

Plaintiff performed work for Defendants pursuant to the Engagement Agreement in New York and elsewhere, including seeking funding from potential New York investors, and "Defendants travelled to New York to attend one of these investor meetings alongside Plaintiff." AC ¶ 16; *see* Woolery Decl. ¶ 14. However, Defendants, along with two other entities controlled by Miller, sued Plaintiff in Texas seeking a declaratory judgment that they were not liable for the fees Plaintiff had billed pursuant to the Engagement Agreement (the "Texas Action"). *See* AC ¶ 20; Miller Decl. ¶ 17(b). Plaintiff thereafter initiated this action to enforce its right to advancement of fees for defending itself in the Texas Action. AC ¶ 24.

1

Defendants, through their new New York counsel, now seek to dismiss this case for lack of personal jurisdiction, lack of venue, and failure to state a claim or, in the alternative, to transfer the case to the Southern District of Texas [ECF Nos. 26, 27, 28, 29].  While it would seem sensible to resolve all of the parties' respective obligations under the Engagement Agreement in one action, Defendants' high-powered new counsel fail to offer the Court a basis for dismissal or transfer of this action, citing inapt cases for the arguments they present and forfeiting other arguments.  As such, Defendants' motion to dismiss or transfer [ECF No. 26] is DENIED.

## I.    BACKGROUND

**A. Facts[1]**

Plaintiff Woolery & Co. PLLC (the "Firm") is a professional limited liability corporation organized under the laws of the State of New York with its sole office in Manhattan, New York. *See* AC ¶ 7; Woolery Decl. ¶ 3.  Its founding partner and member James Woolery, a resident of New York, is "licensed to practice in New York" and is "not licensed to practice in Texas." Woolery Decl. ¶¶ 3, 4; *see* AC ¶ 7.  The Firm has two associates who likewise reside in New York, are licensed to practice in New York, and are not licensed to practice in Texas.  Woolery Decl. ¶ 5. Woolery attests that the Firm's "practice depends on leveraging relationships with New York corporations and other [New York] entities."  *Id.* ¶ 6.

Defendants are 4M Investments LLC and its principal and sole member Ted B. Miller.  AC ¶¶ 8, 9.  4M Investments is a Delaware limited liability company with its principal place of business

---

[1] The facts underlying Plaintiff's claims are taken from the Amended Complaint and accepted as true for purposed of this motion [ECF No. 25 ("AC")].  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  With respect to "jurisdictional facts," the Court considers the affidavits submitted by the parties and exhibits attached thereto [ECF Nos. 28 ("Miller Decl."), 29 ("Campbell Decl."), 32 ("Woolery Decl.")].  *Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 58 (2d Cir. 1981); *see In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

in Houston, Texas. *Id.* ¶ 8; Miller Decl. ¶ 5. Miller is a citizen of Texas who resides in Harris County. AC ¶ 9; Miller Decl. ¶ 3.

Woolery attests that, in August 2023, Miller "reached out to" Woolery "to discuss matters that were ultimately the subject of the Engagement Agreement." Woolery Decl. ¶ 9; *see* AC ¶ 12. Specifically, Woolery attests, Miller sought out Woolery's "expertise in hostile contests." Woolery Decl. ¶ 9; *see also* Miller Decl. ¶ 10 (attesting that he "became concerned about the future of [a company Miller had co-founded and previously led, non-party Crown Castle Inc.,] and believed that its shareholders deserved better leadership," so he "decided to take action[,]" and, "in around August 2023, Mr. Woolery and [Miller] began discussing how he and his firm could assist"). Plaintiff maintains that it did not "solicit the business of Defendants for this engagement." AC ¶ 12; *see* Woolery Decl. ¶¶ 10, 11.

Miller attests that he first met Woolery "over 20 years ago," when "Woolery was an associate" at another New York law firm, which was representing Miller's "then-company, Crown Castle." Miller Decl. ¶ 8. Miller further attests that "[p]rior to executing the engagement agreement relevant to this case," Woolery had "sent [Miller] multiple emails soliciting [his] business in Texas." Miller Decl. ¶ 9. Defendants submit six emails as exhibits in support of this testimony, which span from November 2020 to April 2023. *See* Miller Decl., Exs. A–F.[2] Woolery, however, responds that "Woolery & Co. sends out general updates to all firm contacts," and the "email communications" Defendants submit are merely "these types of general mailer communications." Woolery Decl. ¶¶ 7–8.

---

[2] The November 2020 email is addressed to "Friends and Colleagues," announces the "launch" of the firm, and includes a link to "unsubscribe from this list." Miller Decl., Ex. A. The next four emails similarly contain a generic salutation (except one, which lacks any salutation) and include a link to unsubscribe. *See id.*, Exs. B–E. The April 2023 email is addressed to "Ted," attaches a "Case Study deck, highlighting [the Firm's] recent matters," and does not contain a link to unsubscribe. *Id.*, Ex. F.

Woolery attests that, in September 2023, "Woolery & Co. was formally retained by Mr. Miller and 4M Investments."  Woolery Decl. ¶ 10; *see id.* ¶ 11; AC ¶ 13; Miller Decl., Ex. G (the "Engagement Agreement").  Miller, however, attests that he "signed the Engagement Agreement in [his] capacity as President of 4M Investments" only.  Miller Decl. ¶ 11.  The signature line appears as follows:

Agreed to by,
4M Investments LLC

Sincerely,

James C. Woolery

Ted B Miller Jr (President)
Print Name: Ted Miller

On behalf of Woolery & Co.

Engagement Agreement at 2.

The parties agree that, in the Engagement Agreement, Plaintiff was hired to "provide strategic legal and other advice in connection with a Crown Castle proxy solicitation," including the formation of a "Special Purpose Vehicle," non-party Boots Capital Management, LLC ("Boots Capital"), for investing in Crown Castle.  Miller Decl. ¶¶ 11, 14; *see* Woolery Decl. ¶ 10; AC ¶ 13; Engagement Agreement at 1.[3]

The parties further agree that Plaintiff "was also tasked with seeking investors for Boots Capital."  Miller Decl. ¶ 14; *see* Woolery Decl. ¶ 13.  Woolery specifically attests that the Firm's "contemplated performance under the Engagement [Agreement] was expected to occur in New York, including introducing Defendants to New York firms for potential funding."  Woolery Decl. ¶ 14.  Indeed, the parties agree, "Defendants travelled to New York to attend one of these investor

---

[3] The Engagement Agreement begins: "We are delighted to be engaged by 4M Investments, LLC ('you') to provide you strategic legal and other advice with respect to the formation of a Special Purpose Vehicle ('NewCo') for the purpose of investing in Crown Castle Inc. ('CCI') or other substantial companies in the telecommunications space, sourcing potential capital partners to participate in the investment, the development of an investor presentation and other materials, corporate governance, media relations, shareholder strategy and a preliminary proxy plan." Engagement Agreement at 1.

meetings alongside Plaintiff." AC ¶ 16; *see* Woolery Decl. ¶ 14 (attesting that Defendant "visited New York . . . to attend one of these funding meetings with potential New York investors"); Miller Decl. ¶ 18 ("In December 2023, Mr. Woolery accompanied me and my colleagues to a meeting [in New York] with a potential investor in Boots Capital."). Plaintiff alleges that the Firm, acting as Defendants' agent, also "represented Defendants at other investor meetings in New York, as contemplated by the Engagement Agreement." AC ¶ 16.

Plaintiff submits, and Defendants do not dispute, that the Engagement Agreement "required Defendants to send payment to New York." Woolery Decl. ¶ 11. According to Defendants, "[a]ll payments were made as required under the Engagement Agreement" from Texas to New York "through April 2024." Miller Decl. ¶ 12.

"In connection with the Crown Castle proxy [contest]," Plaintiff represented Miller and Boots Capital in an action in Delaware Chancery Court (the "Delaware Action"). Miller Decl. ¶ 16 ("Woolery served as counsel to Boots Capital and me in that action"); *see* Woolery Decl. ¶ 15. Woolery attests that the representation was successful. *See* Woolery Decl. ¶ 15. Thereafter, in May 2024, Plaintiff "issued Boots Capital an invoice for $2,107,250" for its services in connection with the Delaware Action (the "May 2024 Invoice"). Miller Decl. ¶ 17(a). However, "[t]he May 2024 Invoice was disputed" on the grounds that, first, "it was issued to a party – Boots Capital – who never entered into an engagement agreement with Woolery & Co." and, second, Defendants assert, it "was unreasonable." *Id*.

The Engagement Agreement, which is less than two pages long, contains one paragraph that is particularly germane to the remaining facts and the pending motion to dismiss. That paragraph, which consists of only two sentences, begins: "This agreement shall be governed by, and construed in accordance with, the laws of the State of New York[.]" Engagement Agreement

at 2.  It proceeds: "In the unlikely event a dispute should arise between you and Woolery & Co, the advancement of any reasonable fees for the resolution of such dispute, whether arbitration or otherwise, is required."  *Id.*

Having refused to pay the May 2024 Invoice, Miller, Boots Capital, 4M Investments, and another LLC Miller owns filed a lawsuit against Plaintiff and Woolery personally in state court in Texas (the "Texas Action").  Miller Decl. ¶ 17(b).  The Texas Action seeks a declaratory judgment that "4M Investments was the only party with an engagement agreement with Woolery & Co." and "no party is liable, at law or in equity, for the May 2024 Invoice."  *Id.*  The Firm and Woolery removed the Texas Action to federal court, where the litigation is ongoing.  *Id.* ¶ 17(d); *see Boots Capital Management, LLC et al. v. Woolery & Co. PLLC et al.*, 4:24-cv-5120 (S.D.T.X.).  Although neither party has mentioned it, the Court notes that the judge presiding over the Texas Action has "determined that the actions [before him and in this Court] are meaningfully different in terms of ultimate relief sought" [4:24-cv-5120, ECF No. 32 (the "SDTX Order")].[4]

## B.  Procedural History

Plaintiff initiated this action by filing a complaint in the Supreme Court of New York, County of New York, and Defendants removed pursuant to the Court's diversity jurisdiction [ECF

---

[4] Defendants misleadingly point out multiple times that, in the Texas Action, the Firm and Woolery "sought permission to bring counterclaims . . . for payment of the May [2024] Invoice."  Miller Decl. ¶ 17(d); *accord* Mem. at 1 (pointing out in their Preliminary Statement that the Firm sought to assert "counterclaims for the fees" in the Texas Action); *id.* at 4 (again repeating that the Firm sought to assert counterclaims in the Texas Action).  Defendants studiously omit that the Firm mooted its own request to file counterclaims in the Texas Action by instead filing a motion to dismiss for lack of personal jurisdiction, which motion remains pending [*see* 4:24-cv-5120, ECF Nos. 5, 8, 17, 24, 32].  *See* SDTX Order at 2.  It appears that, perhaps, Defendants sought to create a false impression that the Firm is currently asserting its right to payment of the May 2024 Invoice under the Engagement Agreement in the Texas Action while separately asserting its rights to advancement under the Engagement Agreement in this Court.  *See* Mem. at 4 ("With this action, Plaintiff has created an anomalous dual track litigation.").  Defendants apparently assumed, incorrectly, that the Court would not bother to review the docket in the Texas Action itself.  However, that docket makes clear that the Firm and Woolery are seeking a dismissal of the Texas Action that does not involve any adjudication of the merits of the parties' disputes about the Engagement Agreement, since, unlike Defendants here, the Firm and Woolery move to dismiss the Texas Action solely for lack of personal jurisdiction and do not raise any 12(b)(6) arguments as alternative grounds for dismissal [*see* 4:24-cv-5120, ECF No. 24].

No. 1]. Consistent with the Court's Individual Rules of Practice in Civil Cases, Defendants filed a pre-motion letter seeking leave to file a motion to dismiss under Rules 12(b)(2), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure [ECF No. 10]. Plaintiff responded to Defendants' pre-motion letter [ECF No. 13]. The Court thereafter issued an Order granting Defendants leave to file a motion to dismiss, but also granting Plaintiff leave to amend its pleading to cure any deficiencies before Defendants filed their contemplated motion [ECF No. 22].

Plaintiff timely filed the Amended Complaint [ECF No. 25 ("AC")]. In the Amended Complaint, Plaintiff alleges that, under the Engagement Agreement, "the advancement of any reasonable fees" incurred to resolve a dispute "is required." AC ¶ 1 (quoting Engagement Agreement at 2). It further alleges that by filing the Texas Action, "Defendants triggered Plaintiff's right to advancement . . . ." *Id.* ¶ 2. Plaintiff asserts claims for (1) breach of contract, (2) specific performance, (3) declaratory judgment, and (4) account stated. *Id.* ¶¶ 25–49. All four claims are based on Defendants' refusal to advance fees in connection with the Texas Action as required by the Engagement Agreement.

Defendants filed a motion to dismiss [ECF Nos. 26, 27 ("Mem."), 28 ("Miller Decl."), 29 ("Campbell Decl.")]. Defendants principally argue that the case should be dismissed for lack of personal jurisdiction. *See* Mem. at 6–15. In arguing that the Court lacks personal jurisdiction over them, Defendants represent, on the very first page of their brief, that "this action has nothing to do with the [dispute] at issue in the Texas Action." Mem. at 1; *see id.* at 8. As such, they contend, "Defendants' contacts with New York . . . before [and] during the engagement are irrelevant." *Id.* at 9. According to Defendants, their only relevant actions, for purposes of personal jurisdiction, are the "initiation of the Texas Action and refusal to advance Plaintiff's fee to defend that action,"

7

which, Defendants contend, "occurred in Texas." *Id.*

Defendants devote two paragraphs of their brief to arguing that venue is improper. *Id.* at 15–16. Defendants also contend that "[a]ll of Plaintiff's claims should be dismissed under Rule 12(b)(6) because the provision of the underlying contract for these claims, the Fee Advancement Provision" is "void as against public policy." *Id.* at 17. They further argue that Miller is not a party to the Engagement Agreement and that Plaintiff fails to state a claim for account stated. *Id.* at 17, 20–21. Finally, Defendants argue that, if the Court declines to dismiss this case, it should be "transferred to Texas under the first-to-file doctrine." *Id.* at 2; *see id.* at 21–23.

Plaintiff filed an opposition to Defendants' motion [ECF Nos. 31 ("Opp."), 32 ("Woolery Decl.")]. With respect to personal jurisdiction, Plaintiff stresses that Defendants chose "to reach out from Texas and retain a New York firm," to establish an ongoing contractual relationship with a New York firm that contemplated and involved performance in New York, to agree to a choice-of-law clause selecting New York law, to send payments to New York, and to travel to New York in connection with the same Engagement Agreement that Defendants have allegedly breached by refusing to advance Plaintiff's reasonable fees in connection with the Texas Action. Opp. at 6–14. Plaintiff further argues that venue is proper, that Plaintiff adequately alleges its claims, and that the first-to-file doctrine is inapplicable, since that doctrine only applies when substantially similar lawsuits are filed in different fora, and Defendants "correctly" point out that this action is different from the Texas Action. Opp. at 16–24. Defendants later filed a reply brief in further support of

8

their motion [ECF No. 33 ("Reply")].

## II.    **LEGAL STANDARDS**

### A.  **Rule 12(b)(2)**

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff must make a *prima facie* showing that the Court has personal jurisdiction over the defendant. *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006); *see Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). "This *prima facie* showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). "In evaluating whether the requisite showing has been made," the Court must "construe the pleadings and any supporting materials in the light most favorable" to the plaintiff. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013). Indeed, where "the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's *prima facie* showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673 (italics added) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)).

### B.  **Rule 12(b)(3)**

Courts "apply the same standard of review in Rule 12(b)(3) dismissals for improper venue as . . . in Rule 12(b)(2) dismissals for lack of personal jurisdiction." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005). "[T]he plaintiff need only make a *prima facie* showing of venue." *Id.* (quoting *CutCo Indus. v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986)). The Court

"must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 520–21 (S.D.N.Y. 2024) (quoting *Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 555 (S.D.N.Y. 2004)); *see Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007); *see In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673 ("factual disputes are resolved in the plaintiff's favor").

## C.  Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in its favor.  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

## III.    DISCUSSION

As explained below, Plaintiff clearly makes a *prima facie* showing of personal jurisdiction over Defendants.  Specifically, Plaintiff makes a sufficient showing that Defendants are subject to personal jurisdiction under section 302(a)(1) of the New York long-arm statute, which authorizes the exercise of jurisdiction over out-of-state defendants for claims arising out of the defendants' business transactions in New York.  *See* N.Y. C.P.L.R. § 302(a)(1); *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996) ("*Agency Rent A Car*").  Defendants' argument that they are not subject to personal jurisdiction in New York relies on pretending that their decision to enter into the Engagement Agreement and their contacts with New York pursuant to the Engagement Agreement are immaterial to this action, which asserts claims arising out of Defendants' alleged breach of the Engagement Agreement.  *See* Mem. at 9; Reply at 2.  However, the Second Circuit has squarely rejected this line of argument.  *See Agency Rent A Car*, 98 F.3d at

31. Moreover, Defendants fail to offer persuasive arguments that venue is improper, that the fee advancement provision is void as against public policy, that Plaintiff otherwise fails to state a claim, or that the first-to-file rule applies to this case.

## A. Plaintiff Makes a *Prima Facie* Showing of Personal Jurisdiction.

On a motion to dismiss for lack of personal jurisdiction, the Court must "determine whether the defendant is subject to jurisdiction under the law of the forum state—here, New York," and, if so, the Court must "consider whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014). Under New York law, a plaintiff must show that either the defendant was subject to general jurisdiction in New York, or that an out-of-state defendant was subject to specific jurisdiction because it "committed acts within the scope of New York's long-arm statute, C.P.L.R. § 302." *DeLorenzo v. Viceroy Hotel Group, LLC*, 757 F. App'x 6, 8 (2d Cir. 2018). It is well-established in this Circuit that "satisfaction of the section 302(a)(1) criteria will generally meet federal due-process requirements." *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 431 (S.D.N.Y. 1998); *see American Girl, LLC v. Zembrka*, 118 F.4th 271, 279 (2d Cir. 2024); *Balmuccino, LLC v. Starbucks Corp.*, 24-cv-6214 (KPF), 2025 WL 2695551, at *10 (S.D.N.Y. Sept. 22, 2025); *Cyberscan Tech., Inc. v. Sema Ltd.*, 06-cv-526 (GEL), 2006 WL 3690651 (S.D.N.Y. Dec. 13, 2006).

Plaintiff does not argue that either defendant is subject to general personal jurisdiction in New York, and, as such, the Court deems any such argument waived. *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). In any event, according to the Amended Complaint, 4M Investments is domiciled in Delaware and Texas, and Miller is domiciled in Texas. *See* AC ¶¶ 8, 9. There are no allegations in the Amended Complaint to suggest that this is "an 'exceptional case,'" in which

11

"an individual's contacts with a forum might be so extensive as to support general jurisdiction notwithstanding domicile elsewhere." *Reich v. Lopez*, 858 F.3d 55, 63 (2d Cir. 2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014) (pointing out that "the Second Circuit has yet to find such a case"). As such, Plaintiff must show that Defendants are subject to specific jurisdiction under one of the provisions of the New York long-arm statute. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021); *Goldfarb v. Channel One Russia*, 442 F. Supp. 3d 649, 661 (S.D.N.Y. 2020); *Symmetra Pty Ltd. v. Hum. Facets, LLC*, 2013 WL 2896876, at *4 (S.D.N.Y. June 13, 2013).

The pertinent provision of the New York long-arm statute, section 302(a)(1), provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state . . . ." N.Y. C.P.L.R. § 302(a)(1). "To determine the existence of jurisdiction under section 302(a)(1), a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether th[e] cause of action 'aris[es] from' such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (second alteration in original) (quoting C.P.L.R. § 302(a)(1) and citing *Deutsche Bank Securities, Inc. v. Montana Bd. of Investments*, 7 N.Y.3d 65, 71, 850 N.E.2d 1140, 1142, 818 N.Y.S.2d 164, 166 (2006)). In deciding the first part of the test, whether a defendant transacts business, "[c]ourts look to 'the totality of the defendant's activities within the forum" to decide whether the defendant engaged in "purposeful activity" in New York. *Best Van Lines*, 490 F.3d at 246 (quoting *Sterling National Bank & Trust Co. of N.Y. v. Fidelity Mortgage Investors*, 510 F.2d 870, 873 (2d Cir. 1975)). "As for the second part of the test, 'a suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the

claim asserted and the actions that occurred in New York.'"  *Id.* (alteration adopted) (quoting *Henderson v. INS*, 157 F.3d 106, 123 (2d Cir. 1998)).

In determining "whether an out-of-state defendant transacts business in New York," the Second Circuit has instructed district courts to consider: "(i) whether the defendant has an on-going contractual relationship with a New York corporation"; "(ii) whether the contract was negotiated or executed in New York" and "whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship"; "(iii) what the choice-of-law clause is in any such contract"; and "(iv) whether the contract requires . . . payments into the forum state." *Agency Rent A Car*, 98 F.3d at 29.  No one factor is dispositive.  *Id.*

Turning to whether a "claim 'arises out of' a defendant's transaction of business in New York," the Second Circuit has explained, as relevant here, that "two elements give rise to a breach of contract claim: (i) a contract between the parties and (ii) an act allegedly in violation of that agreement." *Agency Rent A Car*, 98 F.3d at 31.  As such, a "breach of contract claim 'arises out of' *both*" the contract itself and the alleged breaches that may have "occur[red] outside of New York." *Id.* (emphasis in original).[5]  Indeed, in *Agency Rent A Car*, the Second Circuit reversed a

---

[5] As discussed below, in the venue analysis, the Court does not accept Defendants' entirely unsupported assertion in its opening brief that the breach alleged by Plaintiff occurred in Texas. *See infra* at 24–25.  Here, Plaintiff alleges that Defendants have refused to send to New York money due to be paid in New York under the Engagement Agreement. *See* AC ¶¶ 1–6, 23–24; Woolery Decl. ¶ 11.  A number of courts in this Circuit have ruled that "failure to transfer funds or make payments to an account in New York City is a breach that occurs in New York City." *Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 560 (S.D.N.Y. 2004); *see Edward Roberts, LLC v. Indiana Econ. Dev. Corp.*, 2022 WL 17492467, at \*5 (E.D.N.Y. Nov. 21, 2022); *Saltzman v. La. Auction Exch., Inc.*, 997 F. Supp. 537, 541 (S.D.N.Y.1998) ("there is no question that this Court is a proper venue" since "payment under the terms of the letter agreement was due to plaintiff in New York"); *Nova Int'l, Inc. v. Am. Exp. Bank, Ltd.*, 94-cv-8536 (DC), 1996 WL 39317, at \*8 (S.D.N.Y. Jan. 31, 1996) (finding venue based on failure "to transfer funds to [New York] account"); *Irrigation Tech. Leasing Assocs., Inc. v. Superior Farming Co.*, 90-cv-7482 (JMC), 1991 WL 274479, at \*3 (S.D.N.Y. Dec. 10, 1991) (finding venue based on "failure to make lease payments due in New York").  To be sure, other district courts have ruled that "the breach occurs where the decision to withhold payment is made." *Concesionaria*, 307 F. Supp. 2d at 560 (citing cases).  In their opening brief, Defendants fail to cite a single case in support of their assertion that the breach occurred in Texas, where they made "their decision not to pay Plaintiff," rather than in New York, where the payment was due but not received.  Mem at 16.  Defendants further fail to

decision to dismiss for lack of personal jurisdiction, rejecting the reasoning of the district court that the "sole cause of the dispute" was the out-of-state action allegedly breaching the contract and allegations about the contract itself were "one step removed." *Id.* The Second Circuit explained that the contract was at the "heart" of the claim. *Id.*

Under a straightforward application of *Agency Rent A Car*, Defendants here are subject to personal jurisdiction in New York. With respect to the first part of the test for personal jurisdiction under section 302(a)(1), the *Agency Rent A Car* factors clearly favor concluding that Defendants have transacted business in New York. The first factor is "whether the defendant has an on-going contractual relationship with a New York corporation." *Agency Rent A Car*, 98 F.3d at 29. Here, Defendants entered into the Engagement Agreement with Plaintiff, a New York law firm.[6] *See* AC ¶¶ 7, 13; Woolery Decl. ¶¶ 3, 10, 11; Miller Decl. ¶ 11. As such, the first *Agency Rent A Car* factor clearly favors finding a New York business transaction.

---

acknowledge the split of authority within this Circuit. In their Reply, Defendants cite one case for the proposition that the breach occurred in Texas without offering any supporting arguments of their own. Reply at 6 (citing *I.M.D. USA, Inc. v. Shalit*, 92 F. Supp. 2d 315, 317–18 (S.D.N.Y. 2000)).

[6] As discussed below, Defendants argue that Plaintiff fails to state a claim against Miller because, Defendants contend, Miller was not a party to the Engagement Agreement but rather signed it only in his "capacity as President of 4M Investments." Miller Decl. ¶ 11; *see* Mem. at 17. However, Defendants do not draw any distinction between Miller and 4M Investments in connection with their personal jurisdiction arguments. *See* Mem. at 10–14. As such, Miller has arguably waived the argument that a finding of personal jurisdiction as to his company should not be extended to him. *See Norton*, 145 F.3d at 117 ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed."); *c.f. Grp. One Ltd. v. GTE GmbH*, 523 F. Supp. 3d 323, 333 (E.D.N.Y. 2021) (while brief did not address personal jurisdiction as to company it did specifically contest jurisdiction as to CEO). Assuming Miller has not waived the argument, Plaintiff has the burden of showing personal jurisdiction as to Miller. *See Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013). Plaintiff avers, *inter alia*, that Miller personally solicited Plaintiff in connection with the Engagement Agreement, manifested an intent to be bound by the Engagement Agreement, and "personally benefited" from the Engagement Agreement. Woolery Decl. ¶¶ 9, 15; *see* Opp. at 20. In all events, the parties clearly agree that Miller communicated with Plaintiff, signed the Engagement Agreement, sent payments to New York, travelled to New York, and otherwise acted on behalf of 4M Investments. *See* Miller Decl. ¶¶ 10, 11, 12, 18; *see also Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 338 (S.D.N.Y. 2017) (finding personal jurisdiction as to CEO who executed agreement on behalf of company); *Longview Equity Fund, L.P. v. iWorld Projects & Systems, Inc.*, 2008 WL 833230, at *3 (S.D.N.Y. Mar. 26, 2008). Given Defendants' own failure to draw any distinction between Miller and 4M Investments in connection with their personal jurisdiction arguments, the Court likewise discusses Defendants together.

The second factor is "whether the contract was negotiated or executed in New York" and "whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship." *Agency Rent A Car*, 98 F.3d at 29.  Woolery avers that Miller "reached out" to him (a New York lawyer) to discuss the subject of the engagement, the "Engagement Agreement was drafted in New York," "Miller called and emailed" Woolery in New York "during the course of the negotiation of the Engagement [Agreement] to discuss its terms," and Woolery executed it on Plaintiff's behalf in New York. Woolery Decl. ¶¶ 9, 11, 12.  Moreover, it is undisputed that Miller later travelled to New York, in connection with the Engagement Agreement, to meet with Plaintiff and prospective New York investors.  *See* AC ¶ 16; Woolery Decl. ¶ 14; Miller Decl. ¶ 18.  While Miller maintains that Woolery had previously solicited his business (in Texas), by emailing him about the Firm, as discussed further below, such factual disputes are resolved in Plaintiff's favor in this posture.  *See* Miller Decl. ¶ 9; *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673.  Miller further avers that he "signed the Engagement Agreement in [his] capacity as President of 4M Investments while [he] was in Texas" and that, two months later, "Woolery came to Houston, Texas," during which time the parties agreed "to increase certain fees" under the Engagement Agreement.  Miller Decl. ¶¶ 11, 12.  The Court finds that this factor favors finding that Defendants transacted business in New York because Plaintiff avers that the Engagement Agreement was "partially negotiated in New York," *Agency Rent A Car*, 98 F.3d at 31; *see* Woolery Decl. ¶¶ 9, 11, and, at minimum, Miller certainly "visited New York for the purpose of meeting with" Plaintiff in connection with the Engagement Agreement, *Agency Rent A Car*, 98 F.3d at 29; *see* Woolery Decl. ¶ 14; Miller Decl. ¶ 18.

The third *Agency Rent A Car* factor is "the choice-of-law clause" in the contract. *Id.* Here, the Engagement Agreement contains a choice-of-law clause selecting New York law. *See* Engagement Agreement at 2 (This agreement shall be governed by, and construed in accordance with, the laws of the State of New York[.]"). As such, this factor clearly weighs in favor of finding a New York business transaction. *See Agency Rent A Car*, 98 F.3d at 29.

The fourth and final *Agency Rent A Car* factor includes, as pertinent here, whether the contract required the defendants to "send . . . payments into the forum state." *Id.* Here, Woolery avers, and Defendants do not dispute, that the Engagement Agreement "required Defendants to send payment to New York." Woolery Decl. ¶ 11. Indeed, according to Defendants, all such "payments were made as required under the Engagement Agreement" from Texas to New York "through April 2024." Miller Decl. ¶ 12. This factor therefore weighs in favor of finding a New York business transaction. *See Agency Rent A Car*, 98 F.3d at 29.

"In the years since the *Agency Rent A Car* decision was issued, courts in this Circuit have increasingly considered an additional factor: the location of contract performance." *Seiden v. Baker Tilly Hong Kong Ltd.*, 17-cv-02583 (LTS), 2023 WL 5211157, at *4 (S.D.N.Y. Aug. 14, 2023) (citing cases), *aff'd*, No. 23-1254, 2024 WL 4441582 (2d Cir. Oct. 8, 2024). Here, Woolery expressly avers that the Firm's "contemplated performance under the Engagement [Agreement] was expected to occur in New York, including introducing Defendants to New York firms for potential funding" for Boots Capital. Woolery Decl. ¶ 14. As noted above, the parties agree that, on at least one occasion, Defendants in fact met with potential New York investors in New York. *See* AC ¶ 16; Woolery Decl. ¶ 14; Miller Decl. ¶ 18. Moreover, Plaintiff alleges that, acting as Defendants' agent, Plaintiff communicated with potential New York investors in New York on other occasions. *See* AC ¶ 16. As noted above, by statute, an out-of-state defendant may transact

business in New York through "an agent." N.Y. C.P.L.R. § 302(a)(1). While Miller attests that Plaintiff "contacted at least one Texas company" about investing in Boots Capital, that testimony does not negate the evidence of contract performance in New York. Miller Decl. ¶ 15. As such, the Court finds that this factor also weighs in favor of finding a New York business transaction. *See Seiden*, 2023 WL 5211157, at *4.

Turning to the second part of the test for personal jurisdiction under section 302(a)(1), the Court concludes that Plaintiff's claims arise out of Defendants' transaction of business in New York. *See id.* at 31. All four of Plaintiff's claims arise out of Defendants' alleged breach of the Engagement Agreement. *See* AC ¶¶ 25–49. As explained above, the Engagement Agreement established an ongoing relationship with a New York firm, it was "partially negotiated in New York," Defendants visited New York in connection with performance under the Engagement Agreement, the Engagement Agreement contains a New York choice-of-law clause, required Defendants to make payments into New York, and was performed in part in New York. *Agency Rent A Car*, 98 F.3d at 29–31. As the Second Circuit clearly held in *Agency Rent A Car*, out-of-state conduct allegedly breaching such an agreement arises from business transacted in New York. *See id.* at 31–32.

As noted above, Defendants argue that the "only allegations out of which Plaintiff's claims arose" are "Defendants' initiation of the Texas Action and refusal to advance Plaintiff's fee to defend that action," which "all occurred in Texas." Mem. at 9. They disparage as "convoluted" Plaintiff's argument that "but for Defendants' decision to avail themselves of New York law by entering into the Engagement Agreement, its claims would not exist." Reply at 2. However, the Second Circuit in *Agency Rent A Car* squarely rejected Defendants' argument that the Court should focus narrowly on alleged out-of-state breaches and reversed the district court in that case for doing

17

precisely that.  *See Agency Rent A Car*, 98 F.3d at 31.  There is nothing "convoluted" about considering Defendants' contacts with New York in connection with the Engagement Agreement in an action that alleges a breach of the Engagement Agreement.  Reply at 2.  On the contrary, the Court must consider Defendants' contacts with New York in connection with the formation and performance of contract at the "heart" of this action.  *Id.*

Perhaps recognizing that the binding Second Circuit authority on point defeats its argument for dismissal for lack of personal jurisdiction, Defendants do not even mention *Agency Rent A Car* in their opening brief.  *See generally* Mem.  Instead, Defendants disingenuously quote this Court explaining in a defamation case that "[h]iring an attorney who happens to be based in New York, but who could have performed the same services from an office somewhere else, by itself, is not enough for personal jurisdiction."  Mem. at 10 (quoting *Ditkoff v. Wolff*, 24-cv-1955 (MKV), 2025 WL 919635, at *8 (S.D.N.Y. Mar. 26, 2025)).  As the Court explained in that case, and as defense counsel must be aware, New York courts apply a different, stricter test for "transact[ing] business" in defamation cases, which requires finding that the defendant projected defamatory statements into New York, targeted New Yorkers, and did "something more" in New York.  *Ditkoff*, 2025 WL 919635, at *6.  This action, by contrast, is principally a breach of contract case and is brought by a New York law firm that contends it was solicited to perform, and did perform, services in New York.  *See* Woolery Decl. ¶¶ 9, 14.  Indeed, Woolery expressly disavows that Plaintiff could have performed the same services somewhere else, attesting that "Woolery & Co.'s practice depends on leveraging relationships with New York [companies]," and Defendants hired Plaintiff in part to "introduc[e]" them "to New York firms for potential funding."  *Id.* ¶¶ 6, 14.

Pertinent here, the New York Court of Appeals has held that out-of-state defendants who solicited, retained, and engaged in an "ongoing attorney-client relationship" with a New York

attorney were subject to personal jurisdiction in New York when the attorney filed a "lawsuit seeking damages for breach of contract and unjust enrichment" based on unpaid legal fees. *Fischbarg v. Doucet*, 9 N.Y.3d 375, 379–82 (2007). The Court of Appeals stressed that the defendants had "contacted plaintiff here to retain him and thereby projected themselves into our state's legal services market." *Id.* at 382. Moreover, by "utilizing [the New York attorney's] services," the out-of-state defendants "'invok[ed] the benefits and protections of our laws[] relating to' the attorney-client relationship." *Id.* (alteration adopted) (quoting *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 18, 256 N.E.2d 506 (1970)).[7]

Here, as in *Fischbarg*, Plaintiff submits that Miller "contacted [Woolery] here to retain" Plaintiff. *Id.*; *see* Woolery Decl. ¶ 9. Woolery expressly attests that "Woolery & Co. did not reach out to either Mr. Miller or 4M Investments [and] did not otherwise solicit the business of either Mr. Miller or 4M Investments with respect to the investment in Crown Castle." Woolery Decl. ¶ 10; *see* AC ¶ 12. Miller does not expressly deny that he reached out to Woolery after he "decided to take action" as to Crown Castle. Miller Decl. ¶ 10.

Nevertheless, Defendants contend that Woolery "leveraged his prior relationship with Miller . . . to solicit Defendants' business in Texas." Mem. at 2. Miller contends that Woolery had "sent [him] multiple emails soliciting [his] business." Miller Decl. ¶ 9. However, most of these emails are obviously mass communications, beginning with a generic salutation and ending with a link to unsubscribe. *See* Woolery ¶ 8; Miller Decl., Exs. A–E. Although the final email uses Miller's first name and does not include a link to unsubscribe, it simply attaches a "Case Study deck, highlighting [the Firm's] recent matters." Miller Decl., Ex. F. This email, which is dated

---

[7] Prior to *Fischbarg*, some New York courts had held that "an out-of-state party's retention of a New York attorney in and of itself constitutes a transaction of business in the state under section 302(a)(1) when the attorney seeks to sue the client," while others required more. *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 430 (S.D.N.Y. 1998); *see Reiner v. Durand*, 602 F. Supp. 849, 852 (S.D.N.Y. 1985) (citing cases on both sides).

more than four months before Miller allegedly called Woolery about the subject of the Engagement Agreement cannot fairly be characterized as soliciting Defendants to engage Plaintiff as counsel in connection with the Crown Castle proxy contest. *See id.* In any event, the Court must resolve the factual dispute as to whether Defendants solicited Plaintiff in Plaintiff's favor. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673.

As such, applying *Fischbarg*, Defendants are subject to personal jurisdiction in New York because they solicited, retained, and engaged in an ongoing attorney-client relationship with a New York law firm. *See Fischbarg*, 9 N.Y.3d at 381–82. The Engagement Agreement itself reflect Defendants' receipt of the benefits and protections of New York laws governing the attorney-client relationship, stating: "This letter is provided to you in accordance with Part 1215, Title 22, of the official Compilations of Codes, Rules and Regulations of the State of New York, issued by the four Appellate Divisions, effective March 4, 2002 as a Joint Order applicable to all attorneys of the New York bar." Engagement Agreement at 1; *see Fischbarg*, 9 N.Y.3d at 380. Notably, the out-of-state defendants in *Fischbarg* had never entered New York. *Fischbarg*, 9 N.Y.3d at 381. Here, the case for personal jurisdiction is even stronger because Defendants visited New York in connection with the representation. *See* Woolery Decl. ¶ 14; Miller Decl. ¶ 18. Moreover, as noted above, this is not a case in which Defendants hired "an attorney who happens to be based in New York, but who could have performed the same services from an office somewhere else." Mem. at 10 (quoting *Ditkoff*), 2025 WL 919635, at *8). Rather, the Court at this stage must credit Plaintiff's evidence that Defendants engaged the Firm in large part to leverage its relationship with potential New York investors. *See* Woolery Decl. ¶¶ 6, 13, 14.

20

Defendants argue that *Fischbarg* is inapplicable because this is not an action to recover unpaid attorney's fees. *See* Reply at 3. That argument is unpersuasive. This case, like *Fischbarg*, is an action by a New York law firm "seeking damages for breach of contract," and related claims based on the same underlying facts, from its out-of-state clients. *Fischbarg*, 9 N.Y.3d at 379. It does not matter that the damages sought are for breach of the fee advancement provision, rather than unpaid legal fees, because the claims arise out of the same contract and "ongoing attorney-client relationship." *Id.* at 381.

Thus, applying binding precedents from the Second Circuit and the New York Court of Appeals, the Court concludes that Defendants are subject to specific personal jurisdiction under section 302(a)(1) of the New York long-arm statute. Furthermore, "[f]or the same reasons that [Defendants'] engagement with New York satisfies § 302(a)(1), it also satisfies the minimum contacts requirement" and reasonableness inquiry under the Due Process Clause. *American Girl*, 118 F.4th at 279; *see Chloe*, 616 F.3d at 171 ("We conclude that assertion of personal jurisdiction over [the defendant] comports with due process for the same reasons that it satisfies New York's long-arm statute."); *see also Kelly v*, 2 F. Supp. 2d at 431 ("satisfaction of the section 302(a)(1) criteria will generally meet federal due-process requirements"); *Balmuccino*, 2025 WL 2695551, at \*10. By choosing to reach out to Plaintiff in New York, to enter into the Engagement Agreement, which contains a New York choice-of-law clause, to engage the Firm to leverage its connections with New York investors, to send payments to New York, and to visit New York in connection with the representation, Defendants purposely availed themselves of New York and the benefits and protections of New York law. *See Chloe*, 616 F.3d at 171.

Accordingly, Defendants' motion to dismiss for lack of personal jurisdiction is denied.

**B.  Venue Is Proper.**

Defendants also seek dismissal pursuant to Rule 12(b)(3) for improper venue.  *See* Mem. at 15–17.[8]  They offer only a cursory argument which relies on their contention that "the only acts or omissions that give rise to Plaintiff's claims are Defendants' initiation of the Texas Action and their decision not to [advance] . . . fees" for the resolution of that dispute.  *Id.* at 16.  The Court has already rejected that contention, which pointedly ignores the contract requiring the advancement of fees that Defendants have allegedly breached.

As relevant here, venue is proper in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b)(2).  In evaluating whether venue is proper with respect to a claim for breach of contract,[9] "courts consider a number of factors, including where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred."  *Concesionaria*, 307 F. Supp. 2d at 558 (quoting *PI, Inc.*

---

[8] In a footnote, Defendants assert that, even if venue is proper, the Court "should transfer this case to the Southern District of Texas in the interest of convenience and justice" pursuant to 28 U.S.C. § 1404(a).  Mem. at 17 n.3.  If Defendants had offered any arguments in support of transfer under Section 1404(a), the Court would have had "broad discretion" to make determinations about convenience and fairness.  *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006).  However, Defendants' conclusory assertion in a footnote is plainly insufficient to seek relief where the Court would have to weigh multiple competing factors, including: (1) the plaintiff's choice of forum; (2) the convenience of witnesses; (3) the location of relevant documents and relative ease of access to sources of proof; (4) the convenience of parties; (5) the locus of operative facts; (6) the availability of process to compel the attendance of unwilling witnesses; and (7) the relative means of the parties.  *Id.* at 106–07.  This is not a case in which transfer is obviously appropriate because "there is 'no material connection between this district and the operative facts.'"  *Brown v. Dow Corning Corp.*, 93-cv-5510 (AGS), 1996 WL 257614, at *2 (S.D.N.Y. May 15, 1996) (quoting *Mobile Video Servs., Ltd. v. National Ass'n of Broadcast Employees and Technicians, AFL-CIO*, 574 F. Supp. 668, 671 (S.D.N.Y. 1983)).  As a citizen of New York, Plaintiff's "choice of forum is presumptively entitled to substantial deference."  *Gross v. Brit. Broad. Corp.*, 386 F.3d 224, 230 (2d Cir. 2004).  Defendants have offered no countervailing arguments in connection with the other factors, such as the convenience of witnesses and location of documents.  Thus, by grossly failing to brief their passing request for transfer pursuant to Section 1404(a), Defendants have waived it.  *See Norton*, 145 F.3d at 117.

[9] Courts in this Circuit have ruled that, "[i]n a case of multiple claims, proper venue must be established with respect to each cause of action asserted."  *Rothstein v. Carriere*, 41 F. Supp. 2d 381, 386 (E.D.N.Y. 1999) (citing *Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.*, 927 F. Supp. 731, 735 (S.D.N.Y. 1996)).  However, where, as here, the "plaintiff has alleged [multiple] legal theories, but the same factual allegations underlie all of the claims," courts need not perform multiple separate venue analyses.  *Id.*

*v. Quality Prods., Inc.*, 907 F. Supp. 752, 757 (S.D.N.Y. 1995)).[10]  Venue may be proper here, "even if other material events occurred elsewhere."  *Glasbrenner*, 417 F.3d at 357.

As with personal jurisdiction, in deciding a motion to dismiss for lack of venue, the Court "must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Diaz-Roa*, 757 F. Supp. 3d at 520–21 (quoting *Concesionaria*, 307 F. Supp. 2d at 555); *see Glasbrenner*, 417 F.3d at 355.  As explained above, Plaintiff submits evidence that the Engagement Agreement was negotiated in significant part in New York, since Miller "reached out" to Woolery, who was in New York, about subject of the engagement and, thereafter, "Miller called and emailed" New York "during the course of the negotiation of the Engagement [Agreement] to discuss its terms."  Woolery Decl. ¶¶ 9, 12.  On the other hand, as Miller attests and Plaintiff does not appear to dispute, Woolery and Miller "agreed" to "increase certain fees" under the Engagement Agreement during a meeting in Texas.  Miller Decl. ¶ 12.  The Court notes that the Engagement Agreement was drafted in New York and signed by Woolery in New York, but Miller signed it in Texas.  *See id.* ¶ 11; Miller Decl. ¶ 11.

Plaintiff submits that the Engagement Agreement was performed in significant part in New York.  *See* Woolery Decl. ¶¶ 6, 14.  According to Woolery, the parties "contemplated" that Plaintiff would use its "connections" with New York entities to find potential investors for Boots Capital and introduce Defendants to these "potential New York investors."  Woolery Decl. ¶¶ 6, 14.  Moreover, it is undisputed that Defendants in fact "visited New York . . . to attend one of these funding meetings with potential New York investors."  Woolery Decl. ¶ 14.  Plaintiff further alleges

---

[10] *See also Daniel v. American Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005) ("[W]hen a plaintiff relies on § 1391(b)(2) to defeat a venue challenge, a two-part inquiry is appropriate.  First, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims.  Second, the court should determine whether a substantial part of those acts or omissions occurred in the district where suit was filed . . . .") (internal citation omitted).

that it performed under the Engagement Agreement in New York when it "represented Defendants at other investor meetings in New York." AC ¶ 16. To be sure, Plaintiff also performed under the Engagement Agreement elsewhere. Plaintiff represented Miller and Boots Capital in an action in Delaware Chancery Court. Miller Decl. ¶ 16; *see* Woolery Decl. ¶ 15. In addition, Miller attests that Woolery once "came to Houston, Texas" in connection with the Engagement Agreement. Miller Decl. ¶ 12. Crucially, however, ***Defendants performed under the Engagement Agreement by sending payments to New York***. *See* Woolery Decl. ¶ 11; Miller Decl. 12.

As for where the alleged breach occurred, Defendants repeatedly contend that a key event is their "initiation of the Texas Action" in Texas. Mem. at 2; *accord id.* at 9, 16; *see* Miller Decl. ¶ 17(b); Reply at 2. However, Defendants' filing of the Texas Action by itself is not a breach of the Engagement Agreement, which contemplates the possibility of a "dispute, whether arbitration or otherwise." Engagement Agreement at 2. Rather, the alleged breach is Defendants' refusal to "advance[] . . . any reasonable fees for the resolution of such dispute." *Id.*; *see* AC ¶¶ 1 ("This is an action to enforce Plaintiff's rights to advancement of costs and fees agreed-to pursuant to a written engagement agreement"), 2–6, 23–24.

In its opening brief, Defendants simply assert that their "decision not to [advance]" the fees "occurred exclusively in Texas," without citing a single authority for the purported relevance of this assertion. Mem. at 9; *accord id.* at 16–17. However, the advancement of the fees, like all other payments to Plaintiff under the Engagement Agreement, was due to be paid in New York. *See* Woolery Decl. ¶ 11. As noted above, a number of courts in this Circuit have ruled that "failure to transfer funds or make payments to an account in New York City is a breach that occurs in New York City." *Concesionaria*, 307 F. Supp. 2d at 560; *see supra* n.5; *Edward Roberts*, 2022 WL 17492467, at *5; *Saltzman*, 997 F. Supp. at 541; *Nova Int'l*, 1996 WL 39317, at *8; *Irrigation*

24

*Tech. Leasing Assocs.*, 1991 WL 274479, at *3.  Other courts have ruled that "the breach occurs where the decision to withhold payment is made."  *Concesionaria*, 307 F. Supp. 2d at 560; *I.M.D. USA*, 92 F. Supp. 2d at 317–18.  Defendants fail to acknowledge this split in authority and fail to offer any arguments that the Court should adopt Defendants' position.

The Court need not announce an ironclad rule that, where a party refuses to make a payment due under a contract, the breach necessarily occurs either where the payment was due or where the decision to withhold payment was made.  As the Second Circuit has explained, venue is proper if significant material events occurred here, "even if other material events occurred elsewhere."  *Gulf Ins. Co.*, 417 F.3d at 357.  Here, it is enough to deny Defendants' scantily argued motion to dismiss for improper venue that, Plaintiff avers, the Engagement Agreement was negotiated and performed in significant part in New York, and, in particular, that Defendant performed under the contract by making certain payments into New York, but, thereafter, refused to advance defense fees in breach of the Engagement Agreement.  *See* Woolery Decl. ¶ 11; Miller Decl. 12; AC ¶¶ 1–6, 23–24; *Gulf Ins. Co.*, 417 F.3d at 357; *Concesionaria*, 307 F. Supp. 2d at 560.

Accordingly, Defendants' motion to dismiss for improper venue is denied.

## C. Based on Defendants' Own Representation, the First-To-File Rule Is Inapplicable.

Defendants argue that, if all of their arguments for dismissal fail, the Court should transfer this case to the Southern District of Texas "under the first-to-file doctrine."  Mem. at 22.  In their discussion of that doctrine, Defendants conveniently elide the threshold point that the first-to-file rule only "applies when identical or substantially similar. . . claims" are "brought in different fora." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 116 (2d Cir. 1992).  The rule "embodies considerations of judicial administration and conservation of resources."  *First City Nat. Bank & Tr. Co. v. Simmons*, 878 F.2d 76, 80 (2d Cir. 1989).

25

Defendants themselves, however, expressly avow that "this action has nothing to do with the [dispute] at issue in the Texas Action."  Mem. at 1; *see also id.* at 8; Reply at 1–3.  Moreover, although Defendants omit this point, too, the judge presiding over the Texas Action has already "determined that the actions [before him and in this Court] are meaningfully different."  SDTX Order.  As such, even if the Court were to grant Defendants request to transfer this case to the Southern District of Texas, it seems unlikely that this case would be accepted as related to, and consolidated with, the Texas Action.  In other words, transferring this case to Texas would not serve "considerations of judicial administration and conservation of resources" because this case would still be resolved separately from the Texas Action by a different judge.  *Simmons*, 878 F.2d at 80.

Accordingly, because the first-to-file rule is inapplicable, and, in any event, transfer would not serve the interests of judicial administration and conservation of resources, Defendants' motion to transfer this case pursuant to that rule is denied.

## D.  Plaintiff Adequately States the Claims Defendants Challenge.

Defendants also move to dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a claim.  *See* Mem. at 17–21.  Defendants specifically argue that "[a]ll of Plaintiff's claims should be dismissed . . . because the provision of the underlying contract for these claims, the Fee Advancement Provision, is void . . . . as against public policy."  Mem. at 17.  They argue that "Plaintiff also separately fails to allege a claim for Account Stated."  *Id.*  They further argue that the "claims against Miller should be dismissed because he was not a party to the Engagement Agreement."  *Id.*  Defendants fail to raise any arguments for dismissing Plaintiff's asserted claims for specific performance and declaratory judgment.

i.        **The Fee Advancement Provision Is Not Void as Against Public Policy.**

Defendants argue that "the Fee Advancement Provision is contrary to public policy and therefore unenforceable as a matter of law." Mem. at 20. Defendants incorrectly suggest that an agreement between an attorney and client can never include a fee advancement provision, but that is not the law. To be sure, under New York law, "[f]ee arrangements between an attorney and client are scrutinized with particular care." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 67 (2d Cir. 2000); *see Shaw v. Manufacturers Hanover Tr. Co.*, 68 N.Y.2d 172, 176, 499 N.E.2d 864, 866 (1986). Nevertheless, courts must enforce terms that, the attorney shows, are "fair, reasonable, and fully known and understood by the client." *Revson*, 221 F.3d at 67; *see Beatie v. DeLong*, 164 A.D.2d 104, 108, 561 N.Y.S.2d 448, 451 (1st Dep't 1990); *see also In re Lawrence*, 24 N.Y.3d 320, 339, 23 N.E.3d 965, 978 (2014).

Defendants rely on *Ween v. Dow*, 35 A.D.3d 58 (1st Dep't 2006), in which the Appellate Division held unenforceable a provision "which permits the recovery of attorneys' fees by the attorney should he prevail in a collection action, without a reciprocal allowance for attorneys' fees should the client prevail." *Ween*, 35 A.D.3d at 63–64. The court held that the provision was "fundamentally unfair and unreasonable." *Id.* at 63. It further held that, in addition to the "lack of mutuality," the provision had the "potential for silencing a client's complaint about fees for fear of retaliation for the nonpayment of even unreasonable fees." *Id.*

The provision at issue in this case is not similar to the unenforceable provision in *Ween*. Here, the Engagement Agreement provides that if "a dispute should arise" between the parties, "the advancement of any reasonable fees for the resolution of such dispute, whether arbitration or otherwise, is required." Engagement Agreement at 2. Under this provision, if Plaintiff had sued Defendants when they refused to pay the May 2024 Invoice, Plaintiff would have been "required"

to advance Defendants' attorneys' fees. As such, this provision does not raise any concerns about "lack of mutuality," nor does it have the "potential" to prevent the client from refusing to pay fees he deems unreasonable. *Ween*, 35 A.D.3d at 63–64.

Furthermore, at this stage, Plaintiff has adequately alleged that the provision requiring the advancement of fees was fully known to and understood by Defendants when they executed the Engagement Agreement. *See Revson*, 221 F.3d at 67; AC ¶ 15 ("Defendants had full knowledge and understanding of the provision's inclusion and the scope of the obligations this provision created.") Plaintiff stresses that the Engagement Agreement, which is less than two pages long, was negotiated by "sophisticated counterparties who had extensive experience" with negotiating engagement agreements. AC ¶ 15.[11] Moreover, Defendants do not suggest that they did not have full knowledge and understanding of the fee advancement provision. *See* Mem. at 19–20. On the contrary, Defendants contend that their "'sophistication' and knowledge" is immaterial because, they contend, the provision is "unethical." *Id.*

Defendants offer no authority for their assertion that the fee advancement provision at issue here is void as a matter of law, and the Court is not aware of any such authority. The Court declines to rule that an agreement between an attorney and a highly sophisticated client can never include a reciprocal obligation to advance fees in the event of a dispute, particularly where the provision does nothing to prevent the client from refusing to pay purportedly unreasonable bills. As such, the Court rejects Defendants' argument that all of Plaintiff's claims should be dismissed because they arise out of an unenforceable provision.

---

[11] Of course, an attorney cannot rely on the "sophisticated investor doctrine" to avoid his fiduciary duties to his client. *Johnson v. Proskauer Rose LLP*, 129 A.D.3d 59, 72, 9 N.Y.S.3d 201, 211 (1st Dep't 2015). However, it is self-evident that a court may consider the sophistication of a party to a contract when evaluating whether that party understood a fully-disclosed and unambiguous contract term. *Cf. 2138747 Ontario, Inc. v. Samsung C & T Corp.*, 31 N.Y.3d 372, 381, 103 N.E.3d 774 (2018); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Weir*, 131 A.D.2d 380, 381, 517 N.Y.S.2d 141 (1st Dep't 1987).

### ii.    Plaintiff Adequately Alleges a Claim for Account Stated.

Defendants argue that Plaintiff fails to state a claim for account stated.  *See* Mem. at 20–21.  They argue that Plaintiff's account stated claim is an improper "attempt to have a second bite at the apple in the event that its breach of contract claim fails."  *Id.* at 20.  Defendants also argue that Plaintiff fails to state a claim because it "never presented a specific account, such as an invoice" for the amount allegedly due.  *Id.* at 21.

Plaintiff adequately alleges its claim for account stated.  The First Department has held that "an account stated is an independent cause of action that can be asserted simultaneously with a breach of contract claim and that an account stated claim should not be dismissed as duplicative of a breach of contract claim."  *Aronson Mayefsky & Sloan, LLP v. Praeger*, 228 A.D.3d 182, 187, 212 N.Y.S.3d 52, 56–57 (1st Dep't 2024).  Defendants misleadingly attempt to invoke authority that an account stated claim cannot be used to "circumvent the lack of any contract between the parties" or "collect under a disputed contract."  *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 197 (S.D.N.Y. 2009) (internal quotation marks and citations omitted); *see* Mem. at 23 (citing *Air Atlanta Aero Eng'g*, 637 F. Supp. 2d at 197).  However, such authority is inapplicable to this case, in which there is no dispute that the parties entered into the Engagement Agreement, which requires advancement of fees.

"Under New York law, an 'account stated' refers to a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due."  *Atlanta Aero Eng'g*, 637 F. Supp. 2d at 197 (quoting *White Diamond Co., Ltd. v. Castco, Inc.*, 436 F.Supp.2d 615, 623 (S.D.N.Y. 2006)); *see Ryan Graphics, Inc. v. Bailin*, 39 A.D.3d 249, 250, 833 N.Y.S.2d 448, 449 (1st Dep't 2007).  In New York, attorneys commonly bring account stated claims to recover unpaid fees pursuant to a retainer agreement "based on the defendant's receipt and retention of a plaintiff

29

law firm's invoices seeking payment for professional services rendered, without objection within a reasonable time." *Aronson Mayefsky & Sloan*, 228 A.D.3d at 187, 212 N.Y.S.3d at 57.  However, contrary to Defendants' contention that Plaintiff's claim fails because Plaintiff has not demanded a specific amount, the claim "need not necessarily be based on a final statement of account." *White Diamond*, 436 F. Supp. 2d at 624.

Here, Plaintiff alleges that, after Defendants filed the Texas Action, Plaintiff sent notice to Defendants that it was "invoking its advancement rights under the Engagement Agreement, and asked Defendants to acknowledge their obligation." AC ¶ 3.  Plaintiff further specifically alleges that Defendants did not object to the demand for advancement of fees but rather "simply refused to acknowledge Plaintiff's request." *Id.* ¶ 4.  Thus, Plaintiff has adequately alleged that Defendants had previously promised, in the Engagement Agreement, to advance reasonable fees, that Plaintiff presented a request for payment pursuant to that promise, and that Defendants failed to object.  *See White Diamond*, 436 F. Supp. 2d at 623 ("An objection to an account stated that is first made only after litigation on the account stated has been commenced is, as a matter of law, not made within a reasonable time.").  As such, the Court rejects Defendants' argument that Plaintiff fails to state a claim for account stated under New York law.

### iii.    Whether Miller Is a Party to the Engagement Agreement Is a Factual Dispute that the Court Cannot Resolve at this Stage.

Defendants assert that "Plaintiff's claims against Miller should be dismissed because he was not a party to the Engagement Agreement." Mem. at 17; *see* Miller Decl. ¶ 11.  However, Plaintiff maintains that Miller was a party to the Engagement Agreement.  *See* AC ¶ 26; Woolery Decl. ¶¶ 13, 15.  Accordingly, there appears to be a dispute of fact as to whether Miller was a party to the Engagement Agreement which the Court cannot resolve at this stage.

As an initial matter, the Court must address the standard of review for this issue. In ruling on Defendants' Rule 12(b)(6) motion to dismiss, the Court is confined to the allegations in the Amended Complaint and the Engagement Agreement. *See Chambers v. Time Warner*, Inc., 282 F.3d 147, 152–53 (2d Cir. 2002). However, Defendants have presented evidence outside the pleadings in support of their argument that Miller is not a party to the Engagement Agreement. *See* Miller Decl. ¶ 11 ("I signed the Engagement Agreement [only] in my capacity as President of 4M Investments."). As discussed below, Plaintiff likewise submits evidence that Miller, by his conduct, manifested an intent to be bound by the Engagement Agreement. *See* Woolery Decl. ¶¶ 9, 12, 13, 15. This presentation of evidence outside the pleadings, which both sides urge the Court to consider, requires the Court to treat Defendants' motion to dismiss the claims against Miller "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). As such, the question is whether Defendants have established that there is "no genuine dispute as to any material fact and [Miller] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see McGucken v. Shutterstock, Inc.*, 166 F.4th 361, 368 (2d Cir. 2026).

Defendants, however, have not shown that there is no dispute as to whether Miller was a party to the Engagement Agreement. The Engagement Agreement begins: "We are delighted to be engaged by 4M Investments, LLC ('you')." Engagement Agreement at 1. This sentence suggests that only 4M Investments and Plaintiff are parties to the contract. However, the signature line is less clear:

31

Agreed to by,
4M Investments LLC

Ted B Miller Jr  (President)
Print Name: Ted Miller

Sincerely,

James C. Woolery
On behalf of Woolery & Co.

Engagement Agreement at 2.  Woolery explicitly signed only "[o]n behalf of" Plaintiff.  *Id.*  As for Defendants, however, both names appear, separately, without an express caveat that Miller signed only on behalf of 4M Investments.  *See id.*

More to the point, even assuming that Miller signed the Engagement Agreement only on behalf of 4M Investments, under New York law, a non-signatory can, in limited circumstances, be bound by a contract if his "conduct manifests an intent to be bound by the contract."  *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 239 A.D.2d 171, 172, 657 N.Y.S.2d 632 (1997); *see Mersen USA EP Corp. v. TDK Elecs. Inc.*, 594 F. Supp. 3d 570, 580 (S.D.N.Y. 2022); *Jennings v. Hunt Companies, Inc.*, 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019); *RUS, Inc. v. Bay Indus., Inc.*, 01-cv-6133 (GEL), 2004 WL 1240578, at *20 (S.D.N.Y. May 25, 2004), *aff'd sub nom. Recticel Foam Corp. v. Bay Indus., Inc.*, 128 F. App'x 798 (2d Cir. 2005).  In assessing such an intention to be bound, courts have considered, among other things, whether the non-signatory: was the "real party in interest" to the contract, was heavily involved in negotiating the contract, "micromanaged" performance under the contract, was the key decision-maker, and made payments on behalf of the signatory.  *Ravelombonjy v. Zinsou-Fatimabay*, 632 F. Supp. 3d 239, 260 (S.D.N.Y. 2022); *see Mersen*, 594 F. Supp. 3d at 580 (collecting cases).  Here, Plaintiff maintains that Miller personally negotiated the Engagement Agreement, "directly participated in the matters governed by the Engagement [Agreement], and "personally benefitted from the services Plaintiff provided under the Engagement [Agreement]."  Woolery Decl. ¶¶ 9, 12, 13, 15.

32

To be clear, the Court is not ruling that Miller is a party to the Engagement Agreement who may be held personally liable for its breach.  However, Defendants have not shown that there is no genuine dispute on this point.  *See McGucken*, 166 F.4th at 368.  Accordingly, Defendants' motion with respect to the claims against Miller is denied.[12]

### IV.   CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss or transfer [ECF No. 26] is DENIED.  The Clerk of Court respectfully is requested to terminate docket entry 26.

**SO ORDERED.**

**Date:  March 19, 2026**                         **MARY KAY VYSKOCIL**
**New York, NY**                              **United States District Judge**

---

[12] In addition to waiving its request for transfer of this action pursuant to 28 U.S.C. § 1404(a), *see supra* n.8, Defendants similarly waived the argument that Plaintiff's declaratory judgment should be dismissed as duplicative of the breach of contract claim, *see Optanix, Inc. v. Alorica Inc.*, No. 20-cv-09660 (GHW), 2021 WL 2810060, at *3 (S.D.N.Y. July 6, 2021) (collecting cases), and any challenge to the specific performance claim.